**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | |
|---|---|
| **SHANIQUIA STANLEY**, | ) |
| | ) |
| *Plaintiff,* | ) CIVIL ACTION NO.: |
| | ) |
| v. | ) |
| | ) |
| **BOYS & GIRLS CLUBS OF GREATER** | ) JURY TRIAL DEMANDED |
| **AUGUSTA, INC.,** | ) |
| | ) |
| *Defendant.* | ) |

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Shaniquia Stanley ("Plaintiff"), and files this Complaint for

damages and demand for jury trial against Defendant Boys & Girls Clubs of Greater Augusta,

Inc. ("Defendant" or "BGCGA"). Plaintiff respectfully shows this Court as follows:

### INTRODUCTION

1.      This action arises from Defendant's unlawful discrimination, retaliation, and interference

with Plaintiff's legal rights, including, but not limited to, Defendant's decisions to single out

Plaintiff because of the cost and nature of her disability-related medical care, remove her from

Defendant's group health insurance plan, force her onto inferior individual coverage, refuse to

engage in the interactive process for accommodation, retaliate against her for objecting to that

conduct, and terminate her employment.

2.      Defendant expressly tied Plaintiff's removal from group coverage to the expense of her

medical conditions, including multiple sclerosis and Crohn's disease. Defendant then ignored

1

repeated warnings that the replacement coverage would not permit Plaintiff to obtain necessary treatment and medication.

3.      When Plaintiff continued to complain that she could not obtain medically necessary care, Defendant terminated her employment under the pretext of performance issues, even though she had not been disciplined, placed on a performance improvement plan, warned that her job was in jeopardy, or given negative written evaluations.

4.      Plaintiff brings claims for disability discrimination, failure to accommodate, and retaliation under the Americans with Disabilities Act of 1990, as amended ("ADA"); interference and retaliation under Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"); and health-status discrimination and interference under ERISA's health-status nondiscrimination provisions, as amended and reinforced by the Patient Protection and Affordable Care Act ("ACA").

## JURISDICTION AND VENUE

5.      Plaintiff's claims present federal questions under the ADA, ERISA, and the ACA. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 12117, and 29 U.S.C. § 1132(e).

6.      This Court has authority to award legal and equitable relief under the ADA, ERISA, and other applicable federal law.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as incorporated by the ADA, because Defendant resides in this District, the unlawful

employment practices occurred in this District, the relevant employment records are maintained in this District, and Plaintiff worked in this District.

8.      This Court has personal jurisdiction over Defendant because Defendant is a Georgia corporation with its principal office in Augusta, Georgia, and because Defendant conducts business and committed the unlawful acts alleged herein within this District.

## ADMINISTRATIVE PROCEEDINGS

9.      On June 7, 2024, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant alleging disability discrimination and retaliation.

10.     On February 12, 2026, Plaintiff received a Notice of Right to Sue from the EEOC.

11.     This lawsuit is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue.

12.     Plaintiff's EEOC Charge and Notice of Right to Sue are attached as Exhibit A. Plaintiff has exhausted all administrative prerequisites to suit under the ADA, or those prerequisites have been satisfied, waived, or excused. Plaintiff is not required to exhaust administrative remedies before the EEOC for her ERISA claims.

## PARTIES

13.     Plaintiff is a resident of Georgia and, at all relevant times, worked for Defendant in Augusta, Georgia.

14.     Defendant Boys & Girls Clubs of Greater Augusta, Inc. is a Georgia domestic nonprofit corporation with its principal office located at 624 Chafee Avenue, Augusta, Georgia 30904.

15.     Defendant's registered agent is Kim Evans, 624 Chafee Avenue, Augusta, Georgia 30904.

16.     At all relevant times, Kim Evans served as Defendant's Chief Executive Officer and Bridgett Carrington served as Defendant's Chief Financial Officer and/or senior finance executive.

17.     At all relevant times, Defendant employed more than fifteen (15) employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year and was an employer subject to the ADA.

18.     Upon information and belief, Defendant employed at least fifty (50) full-time employees and/or full-time equivalent employees during the relevant period, sponsored or maintained an employee group health plan, and was subject to applicable federal health-benefits nondiscrimination requirements.

## STATEMENT OF FACTS

19.     Plaintiff was hired by Defendant on or about August 30, 2021, as Director of Academic Success.

20.     When Plaintiff was hired, she disclosed that she had multiple sclerosis ("MS"), a disability within the meaning of the ADA.

21.     Plaintiff also later developed and/or disclosed Crohn's disease, another serious medical condition that requires ongoing medical care.

22.     Plaintiff's MS and Crohn's disease substantially limit one or more major life activities, including but not limited to neurological function, immune function, digestive function, mobility, and major bodily functions.

23.     Defendant was aware of Plaintiff's disabilities and her need for consistent medical treatment and prescription medication.

24.     During her employment, Plaintiff was promoted twice and ultimately served as Vice President of Impact and Outcomes and/or Vice President of Academic Success.

25.     Plaintiff performed her job successfully. She received multiple bonuses, merit increases, and public praise from senior leadership, including Defendant's CEO, Kim Evans.

26.     Plaintiff never received written discipline or counseling for poor performance during her employment.

27.     Plaintiff never received a performance improvement plan.

28.     Plaintiff never received a negative performance evaluation during her employment.

29.     Plaintiff also received a raise in or around May 2024, shortly before Defendant terminated her employment.

30.     Before the events at issue, Plaintiff was covered under Defendant's group health insurance plan.

31.    Defendant's group health plan allowed Plaintiff to continue seeing her established physicians, including physicians in New Jersey who treated her MS.

32.    Before relocating to Augusta, Plaintiff resided in New Jersey. After moving to Georgia, she continued using her New Jersey doctors because she could not obtain timely care from an MS physician in Augusta.

33.    Under Defendant's original group health plan, Plaintiff was able to manage her care through a combination of virtual visits and periodic in-person visits.

34.    During her employment, Plaintiff missed only limited time to travel to New Jersey for medical appointments, including trips in May 2022 and September 2023.

35.    In or around January 2024, Plaintiff informed Evans that she had also been diagnosed with Crohn's disease.

36.    In or around January 2024, Plaintiff was called into a meeting with Evans and Bridgett Carrington, Plaintiff's direct supervisor and Defendant's senior finance executive.

37.    During that meeting, Evans informed Plaintiff that Defendant's health-insurance premiums were increasing because of Plaintiff's medical conditions and coverage.

38.    Evans told Plaintiff that keeping Plaintiff on the group plan would cost Defendant approximately $63,000 to $67,000 more in premiums.

39.    Evans and Carrington asked or directed Plaintiff to accept an individual insurance policy that they represented would be comparable to the group plan.

6

40.    Plaintiff was not given a meaningful choice. She understood that Defendant would not allow her to remain on the group plan and that refusing the individual plan would jeopardize her access to needed medical care and medication.

41.    Plaintiff was the only employee removed from Defendant's group health insurance plan and placed on an individual or marketplace plan.

42.    Defendant did not consult Plaintiff before selecting the substitute plan to determine whether it would actually cover her treating physicians, specialists, prescriptions, or medically necessary treatment.

43.    In addition to premiums deducted from her paycheck for the substitute plan, Plaintiff was required to pay an additional amount for "Angle Insurance," which was not the same insurance company used by other employees and which other employees covered under Defendant's group health plan were not required to pay.

44.    Defendant's actions were not a uniformly applied feature of a bona fide health plan. Defendant made an individualized employment and benefits decision directed at Plaintiff because of her disabilities, health status, expected claims, and medical costs.

45.    On or about March 6, 2024, Plaintiff texted Carrington asking for her insurance information so she could try to make medical appointments.

46.    After the new insurance was issued, Plaintiff began contacting her doctors to determine whether they accepted the new plan.

47.    Plaintiff's New Jersey physicians informed her that they did not accept the plan Defendant selected for her.

48.     Plaintiff then contacted the Atlanta Neurology Center. Although it was accepting new patients, it did not accept the new Anthem insurance plan Defendant had placed Plaintiff on.

49.     Plaintiff then contacted other neurology providers in Augusta, but she was told either that they were not accepting new patients or that she would have to wait eight to twelve months for an appointment.

50.     Those delays were medically unacceptable because Plaintiff required ongoing treatment and monthly medication for MS.

51.     Plaintiff reported to Carrington that she could not access timely and necessary medical treatment under the plan Carrington had selected for her.

52.     On or about March 13, 2024, Plaintiff texted Carrington that the Anthem plan was not national and therefore would not allow her to see her New Jersey doctor.

53.     On or about March 17, 2024, Plaintiff texted Carrington that she needed to go to urgent care and needed her new insurance information.

54.     On or about March 18, 2024, Plaintiff again texted Carrington that she needed her insurance information.

55.     Carrington responded that the policy had not yet been switched from Anthem to United Healthcare and was still pending.

56.     As of early April 2024, Plaintiff still could not log into the insurance platform because Carrington remained the account holder and had not provided Plaintiff with login credentials for her own health insurance.

57.     On or about April 3, 2024, Plaintiff texted Carrington that she was trying to sign into the United Healthcare website but could not because the emails were going to Carrington.

58.     On or about April 5, 2024, Plaintiff sent another text to Carrington asking for the verification code needed to access the insurance platform.

59.     When Plaintiff was finally able to access information about the plan, she learned that it was not a PPO plan.

60.     Unlike Defendant's group plan, the substitute plan required Plaintiff to obtain a referral from a primary care physician before she could see an MS specialist.

61.     Plaintiff had not been required to obtain such referrals under the group plan and had not had to manage her care that way for years.

62.     Plaintiff told Carrington that the plan would not work because she would have to pay for a primary care doctor visit to obtain a referral and then pay again to see the specialist, while the rest of the company remained on a PPO plan that did not require referrals.

63.     Carrington suggested that Plaintiff speak to Richard Poythress, Carrington's friend and not an employee of Defendant, about Plaintiff's issues with the plans presented to Plaintiff.

64.     Plaintiff spoke with Poythress, who told her that her only options were the United Healthcare non-PPO option or the Anthem plan that did not cover her New Jersey doctor, and that Plaintiff should try to deal with it.

65.     Poythress also suggested that Plaintiff could perhaps see a "regular doctor" to be treated for MS, which was not a reasonable substitute for specialized neurological care.

66.     On or about May 2, 2024, Plaintiff sent a message to Carrington advising that she was still unable to see a doctor or receive medical care.

67.     Plaintiff told Carrington that she had called numerous doctors in the directory and was repeatedly told that doctors either did not accept the plan, no longer accepted the plan, did not accept HMO plans, or could not see her until approximately October 2024.

68.     Plaintiff also told Carrington that she needed her monthly MS medication and could not even schedule with a local neuroscience provider without a referral.

69.     Plaintiff could not obtain a referral because she could not get a timely appointment with a primary care physician.

70.     Because the substitute insurance was limited geographically and did not cover her New Jersey physician, Plaintiff could not obtain the medication from her existing treating doctor through the plan.

71.     Plaintiff asked her New Jersey physician to write the prescription for her MS medication, but the pharmacy rejected it because the physician was not in-network with United Healthcare.

72.     Plaintiff asked Carrington about switching her to the United Healthcare PPO plan.

73.     On or about May 3, 2024, Plaintiff sent another message to Carrington asking for the code needed to access the insurance platform.

74.     On or about May 10, 2024, Plaintiff texted Carrington that they had never touched base on her insurance and that, because Plaintiff still could not obtain a primary care appointment before October, she remained without medication.

75.    On or about May 13, 2024, Plaintiff again tried to obtain Carrington's help accessing the United Healthcare website.

76.    Carrington then told Plaintiff that the PPO option was available only through a group plan through an employer, and that Plaintiff had no option but the HMO.

77.    The HMO option was not equivalent to the PPO plan offered to Defendant's other employees.

78.    On or about May 22, 2024, Plaintiff texted Carrington that she was still trying to find a medical insurance policy that would meet her needs.

79.    Carrington responded that United Healthcare did not offer the PPO plan through the Georgia marketplace.

80.    Plaintiff again complained to Carrington that she could not obtain her MS medication.

81.    Carrington acknowledged the problem, stating in substance that she knew Plaintiff was not able to get the monthly shot and asking whether the prescription presented the same issue.

82.    Plaintiff informed Carrington that she was still without an MS doctor, that she desperately needed one, and that she could not find a primary care physician with an available appointment before October.

83.    On or about May 28, 2024, Plaintiff again asked Carrington for an update.

84.    On May 28, 2024, Carrington again stated that United Healthcare did not offer the PPO plan to individuals in the marketplace and that it was available only through employers. At all

times relevant Carrington knew that she and other employees of Defendant other than Plaintiff could elect coverage under Defendant's PPO group health plan.

85. Defendant therefore knew, no later than May 2024, that Plaintiff had been removed from the group plan, placed on inferior individual coverage, and left unable to obtain necessary medical treatment and MS medication.

86. On or about June 3, 2024, Defendant terminated Plaintiff's employment.

87. Defendant claimed Plaintiff was terminated for performance-related reasons.

88. Defendant's stated performance reasons were false and pretextual.

89. Before June 3, 2024, Defendant had never told Plaintiff that her job was in jeopardy.

90. Before June 3, 2024, Defendant had never disciplined Plaintiff for poor performance, issued a written warning, placed her on a performance improvement plan, or given her a negative performance evaluation.

91. Defendant's assertion that Plaintiff was responsible for budget details for the summer camp program is false or misleading.

92. Plaintiff's role with respect to summer camp was limited to procurement of supplies for camp sites based on budget information provided by Carrington.

93. Plaintiff asked to be involved in establishing budget guidelines but was denied by Carrington, who told Plaintiff that budget parameters were determined by Carrington and Evans.

94.    Plaintiff was terminated shortly after her May 2024 complaints that the insurance coverage Defendant elected for Plaintiff prevented her from obtaining needed MS treatment and medication.

95.    During the termination meeting, Defendant told Plaintiff that unless she signed a severance agreement immediately, her health insurance would be cancelled immediately.  The severance agreement did not advise Plaintiff to consult an attorney and specifically referred to rights under 29 U.S.C. §§ 623-626 but did not give Plaintiff even a period of twenty-four (24) hours to consider it and included no revocation rights.  The severance agreement purports to waive rights which cannot be waived under federal and/or state law.

96.    Defendant also told Plaintiff that she would forfeit her final earned paycheck unless she signed the severance agreement.  The severance agreement offered Plaintiff insufficient consideration and/or payments to which she was already legally entitled.

97.    Given Plaintiff's serious medical conditions, need for ongoing medication, and Defendant's knowledge that Plaintiff had already been unable to access care, Defendant's threat placed Plaintiff under medical and economic duress.

98.    Plaintiff signed the severance agreement under duress and without a meaningful opportunity to consider her rights.  Plaintiff's signing of the severance agreement was not knowing or voluntary.

99.    To the extent Defendant contends that the severance agreement waives any claims in this action, the alleged waiver is invalid, void, voidable, unenforceable, and/or ineffective. It was

obtained through duress, coercion, and the threatened immediate loss of health insurance needed for Plaintiff's serious medical conditions and earned wages.

100.    Defendant's removal of Plaintiff from the group health plan, refusal to restore equivalent coverage, failure to address her repeated complaints, termination, and coercive severance tactics were motivated by Plaintiff's disabilities, health status, medical costs, and protected complaints.

## COUNT I

### DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

101.    Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

102.    Plaintiff is a qualified individual with a disability within the meaning of the ADA.

103.    Plaintiff was able to perform the essential functions of her job with or without reasonable accommodation.

104.    Defendant discriminated against Plaintiff because of her disabilities by, among other things, removing her from the group health insurance plan, forcing her onto inferior individual coverage, altering the terms, conditions, and privileges of her employment, and terminating her employment.

105.    Defendant also discriminated against Plaintiff by using her disabilities, health status, expected insurance claims, and disability-related medical costs as reasons to deny her equal employment benefits and equal access to group health coverage.

14

106.    Defendant's conduct was intentional, willful, malicious, and/or undertaken with reckless indifference to Plaintiff's federally protected rights.

107.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered damages, including lost wages, lost benefits, loss of health coverage, medical expenses, emotional distress, humiliation, inconvenience, and other damages allowed by law.

## COUNT II

## FAILURE TO ACCOMMODATE AND FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS IN VIOLATION OF THE ADA

108.    Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

109.    Plaintiff has disabilities within the meaning of the ADA.

110.    Defendant knew of Plaintiff's disabilities and knew that Plaintiff required ongoing medical treatment and medication.

111.    Plaintiff repeatedly informed Defendant that the substitute insurance coverage prevented her from accessing medically necessary care, including MS treatment and medication.

112.    Plaintiff requested assistance, correction of the insurance problem, and/or restoration to coverage that would permit her to access necessary treatment.

113.    Defendant failed to engage in a good-faith interactive process regarding Plaintiff's disability-related need for adequate and comparable coverage or other reasonable measures that would allow her to obtain necessary medical care.

15

114.    Defendant failed to provide a reasonable accommodation and instead maintained an inferior individual insurance arrangement that prevented Plaintiff from obtaining necessary treatment.

115.    Defendant's failure to accommodate and failure to engage in the interactive process violated the ADA.

116.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered damages, including lost wages, lost benefits, loss of health coverage, medical expenses, emotional distress, humiliation, inconvenience, and other damages allowed by law.

## COUNT III

## RETALIATION IN VIOLATION OF THE ADA

117.    Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

118.    Plaintiff engaged in protected activity under the ADA by opposing Defendant's intentional discrimination on the basis of Plaintiff's disability, disability-based insurance interference, complaining that Defendant's removal of her from the group plan prevented her from obtaining disability-related medical care, refusing to engage in the interactive process for accommodation, and requesting that Defendant correct the problem.

119.    Defendant knew of Plaintiff's protected activity.

120.    Defendant subjected Plaintiff to materially adverse actions after she engaged in protected activity, including but not limited to maintaining inferior insurance coverage, refusing to correct

the insurance problem, terminating her employment, and coercing her to sign a severance agreement by threatening immediate loss of health insurance.

121.    There was a causal connection between Plaintiff's protected activity and Defendant's adverse actions.

122.    Defendant's asserted reasons for terminating Plaintiff were pretextual.

123.    Defendant retaliated against Plaintiff in violation of the ADA.

124.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff suffered damages, including lost wages, lost benefits, loss of health coverage, medical expenses, emotional distress, humiliation, inconvenience, and other damages allowed by law.

## COUNT IV

### ERISA SECTION 510 INTERFERENCE AND RETALIATION

125.    Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

126.    Defendant sponsored, maintained, administered, and/or participated in an employee welfare benefit plan within the meaning of ERISA, including a group health insurance plan for eligible employees.

127.    Plaintiff was a participant and/or beneficiary of Defendant's ERISA-covered group health plan and entitled to ERISA plan benefits..

128.    ERISA Section 510, 29 U.S.C. § 1140, prohibits an employer from discharging, disciplining, discriminating against, or otherwise taking adverse action against a participant or

17

beneficiary for exercising rights under an employee benefit plan or for the purpose of interfering with the attainment of rights to which the participant may become entitled under the plan.

129.    Defendant removed Plaintiff from its group health plan, forced her onto inferior individual coverage, refused to restore equivalent coverage, and terminated her employment with the specific intent to interfere with Plaintiff's attainment, exercise, and continued enjoyment of rights and benefits under Defendant's ERISA group health plan's benefits. Defendant told Plaintiff that unless she signed Defendant's severance agreement immediately upon termination, any ERISA plan benefits to which she was or may be entitled would be cancelled immediately.

130.    Defendant acted to reduce, avoid, or shift the cost of Plaintiff's disability-related medical care and expected claims.  Defendant's decision to immediately discharge Plaintiff was also to prevent and/or interfere with her ability to utilize Defendant's health and welfare plan benefits.

131.    Defendant further retaliated against Plaintiff for complaining about and attempting to exercise her rights to obtain benefits and medically necessary treatment under Defendant's health-benefits arrangement.

132.    Defendant's conduct violated ERISA Section 510, 29 U.S.C. § 1140.  Plaintiff has been damaged as a result of Defendant's interference with her rights under ERISA, including by her failure to receive benefits promised and provided to Defendant's employees and for which she was qualified.

133.    Plaintiff seeks all relief available under ERISA Section 502, 29 U.S.C. § 1132, including equitable relief, restoration of benefits or equivalent relief, lost benefits, reinstatement and/or front pay, attorneys' fees, costs, and all other appropriate relief.

<u>**COUNT V**</u>

**HEALTH-STATUS DISCRIMINATION AND BENEFITS INTERFERENCE UNDER ERISA, AS AMENDED BY THE ACA**

134.    Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

135.    This count is pled in the alternative to, and in addition to, Plaintiff's ERISA Section 510 claim.

136.    Federal law prohibits group health plans, plan sponsors, and health-insurance arrangements from discriminating against an individual participant with respect to eligibility, continued eligibility, benefits, premiums, or contributions based on health status, medical condition, claims experience, disability, receipt of health care, medical history, or other health-status-related factors.

137.    These protections include ERISA's health-status nondiscrimination provisions, including 29 U.S.C. § 1182, as amended and reinforced by the ACA and related federal health-benefits statutes.

138.    Defendant violated these federal health-status nondiscrimination requirements by singling Plaintiff out because of her disabilities, medical conditions, claims experience, expected healthcare costs, and need for expensive treatment.

139.    Defendant required Plaintiff, and only Plaintiff, to leave the group health plan and accept individual or marketplace coverage that was inferior to the group coverage maintained for other employees.

140. Defendant thereby imposed different eligibility terms, different coverage conditions, and different contribution and access requirements on Plaintiff because of her health status and disability-related medical costs.

141. Defendant's conduct caused Plaintiff to lose access to physicians, prescriptions, and medically necessary treatment, and caused her to incur economic, medical, and emotional harm.

142. Plaintiff seeks all relief available under ERISA, the ACA, and other applicable federal law, including equitable relief, restoration of benefits or equivalent relief, lost benefits, reinstatement and/or front pay, attorneys' fees, costs, and all other appropriate relief.

143. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and award the following relief:

A. That summons issue and Defendant be served with the Summons and Complaint;

B. That Plaintiff receive a trial by jury on all issues so triable;

C. That judgment be entered in favor of Plaintiff and against Defendant on all counts;

D. That Plaintiff be awarded back pay, front pay, lost benefits, lost health insurance benefits, and other economic damages;

E. That Plaintiff be awarded compensatory damages for emotional distress, humiliation, inconvenience, and other non-economic injuries recoverable under the ADA;

F. That Plaintiff be awarded punitive damages under the ADA;

G.  That Plaintiff be awarded appropriate equitable relief under ERISA, including restoration of benefits, surcharge, make-whole relief, reinstatement and/or front pay, injunctive relief, declaratory relief, and all other equitable relief necessary to remedy Defendant's unlawful conduct;

H.  That the Court declare that any purported waiver or release of any claims obtained at Plaintiff's termination meeting does not bar Plaintiff's claims and/or recovery in this action;

I.  That Defendant be enjoined from continuing or repeating the unlawful practices alleged in this Complaint;

J.  That Plaintiff be awarded attorneys' fees, litigation expenses, costs, and pre-judgment interest on all unpaid wages, the value of benefits, or other damages from the date incurred as allowed by law; and

K.  That Plaintiff receive such other and further relief as the Court deems just and proper.

Respectfully submitted this 12th day of May, 2026.

/s/ Tracey T. Barbaree
Tracey T. Barbaree
GA Bar No. 036792
MOELLER BARBAREE LLP
1355 Peachtree Street N.E.
Suite 1100
Atlanta, GA  30309
Phone: 404.748.9122
Email:tbarbaree@moellerbarbaree.com

/s/ J. Stephen Mixon
J. Stephen Mixon
GA Bar No. 514050
THE MIXON LAW FIRM

21

3344 Peachtree Road
Suite 800
Atlanta, GA 30326
Phone: 770.955.0100
Email:steve@mixon-law.com

*Attorneys for Plaintiff*